KANSAS CITY, Respondent, v. JOHN FEE, Appellant.

Kansas City Court of Appeals, June 30, 1913.

1. SCHOOL DISTRICTS: Exercise of Police Power: Amenability of Schools and School Employees to Police Regulations. A fireman in charge of a steam boiler who was required by a city ordinance to be examined and licensed cannot defend a charge of violating said ordinance by showing that he was employed by the school district to manage said boiler. The ordinance was an exercise of purely police power affecting the health and safety of persons, and freedom from danger of destruction of the property of the city and of its citizens, and was, in no sense an interference with or encroachment upon the authority of the school board or its work of controlling, directing and maintaining its system of education.

2. ————: **Municipal Corporations: Spheres of Action Belonging Respectively to the City and the District.** Our laws have committed to the school boards the work of educating, and furnishing free public instruction to, the young of the state, but has not given to such boards governmental police power. That is committed to the city. Neither can interfere with the other in its respective domain. The school district can perform its work and still be amenable to necessary police regulations. In this case the district by its rule admits this, 'and it is only the employee who attempts to raise this objection on behalf of the district.

Appeal from Jackson Criminal Court.—*Hon. Ralph S. Latshaw*, Judge.

AFFIRMED.

*Gage, Ladd & Small* for appellant.

The school district of Kansas City is an independent public governmental corporation, and has the sole and exclusive power to provide heating apparatus, of such kind as it may determine, for its school houses, and has the sole power to employ janitors or firemen or other servants, and to prescribe their powers, duties and compensation, and therefore, necessarily, their qualifications. Hence, the city has no power or control whatever, over the heating apparatus or firemen or janitors of said school district while working, therewith, and the ordinance of Kansas City was void and had no application as to the defendant or the heating apparatus he was using. R. S. 1909, secs. 10979, 10980, 10983, 10784; Waterworks Co. v. School District, 23 Mo. App. 236-243; State ex inf. Lowe v. Henderson, 145 Mo. 329; School District v. School District, 184 Mo. 140; City of Milwaukee v. McGregor, 140 Wis. 35, 121 N. W. 642; City of Fulton v. Sims, 127 Mo. App. 677; Kentucky Inv't v. Louisville, 127 Mo. App. 677, 97 S. W. 402. A school district is but an arm of the State. State ex rel. v. Gordon, 231 Mo. 574.

*A. F. Evans, A. F. Smith* and *Hunt C. Moore* for respondent.

. An employee of the school district of Kansas City is subject to the provisions of the Revised Ordinances of Kansas City. 1 Freund Police Power, sec. 135; Railroad v. New York, 165 U. S. 628; Railroad v. Arkansas, 219 U. S. 453-462; United States v. Bateman, 34 Fed. 86; United States v. Tully, 140 Fed. 899, 905; Sec. 9764, R. S. 1909; McQuillin Municipal Ordinances, sec. 271, 418; 3 McQuillin Municipal Corporations, sec. 899, p. 1910.

TRIMBLE, J.—This is an appeal from a judgment of the criminal court of Jackson county, wherein appellant was, on an appeal from the municipal court, convicted of a violation of one of the ordinances of Kansas City. That ordinance provides that no person, not a fireman or engineer licensed by the city, shall be in charge of any steam boiler used for heating purposes carrying over fifteen pounds of steam to the square inch, and any person violating such provision shall be deemed guilty of a misdemeanor and fined not less than one dollar nor more than $500 and each day's violation shall be deemed a separate offense. It is admitted that defendant was, at the time of the filing of the information against him, the janitor of the Washington school, one of the public schools, in Kansas City, and as such janitor was directly in charge of its steam heating boiler which carried from twenty-five to thirty pounds of steam to the square inch, and that he was not a fireman or engineer licensed by the city as provided by said ordinance. He was arrested for violating said ordinance, was convicted in the municipal court and again in the criminal court on appeal, and now brings the case here.

The real, and the only, question presented by the defense is whether or not Kansas City has any power

or authority to make any regulations governing or
binding upon public school employees, when such reg-
ulations are prescribed solely in the exercise of the
city's police power to provide for the health and safety
of its citizens and the freedom from danger by vio-
lence of both persons and property, and when such reg-
ulations have such objects for their only end and pur-
pose? The defendant does not state the question with-
in these limits. He prefers to make it broader than
that and raise the question whether or not the public
schools of the city are subject to the government, con-
trol and domination of the city in regard to matters
in general. And under the wide spreading wings of
such a question he cites authorities denying the city
such broad and comprehensive power, and urges them
as conclusive on the question of whether the city has
the narrow authority above set out. This method in-
volves a fallacy so frequently met with as to become
familiar although often buried under the cover of
much legal argumentation. When stripped of every
cover and disguise, the question here is found to be:
Are the public schools, or rather more specifically in
this case, are the employees of the public schools lo-
cated within a city subject to those regulations of the
city which are purely police regulations and do not
involve any other limitation or control?

Our laws vest in the public school authorities the
"supervision of instruction" but nowhere gives them
governmental *police power*. [R. S. Mo. 1909, secs.
10979, 10980, 10983, 10784.] In other words, the school
authorities are supreme in all matters directly, or by
implication, involving the subject of education, but with
the matter of governmental police regulations, hav-
ing to do solely with the maintenance of public order
and peace, the health, safety and freedom from vio-
lence of the citizens of the State and the protection
of property from destruction by violence, the school

authorities have nothing to do. And it is well for them that they do not.

On the other hand the law vests such authority over police matters in the city. [R. S. Mo. 1909, sec. 9764.] And such authority is given without restriction or exception. Within that sphere, the city has, so to speak, as exclusive authority as the school board has within the sphere of educational matters. Neither can interfere with the other in the exercise of the respective governmental functions confided to each. The work of education and everything necessary or impliedly necessary to the carrying on of the work is committed to the school board, and the city has no right to interfere with that work or direct how it shall be done; and the work of maintaining public order, establishing and enforcing police regulations which preserve the health and safety of persons and property, is committed to the city, and the school board has no right to interfere with that work, nor is it or its employees exempt from such police regulations.

It will not do to say that fining of this janitor fireman for runing a boiler without a city license is an interference with the board in its work of education. To say that the board, in order to be left wholly free to carry on its work of education, must, with its employees, be absolutely free from all matters of purely police regulation, is to say that the board cannot attend to the work of education unless it is allowed to violate, or at least pay no attention to, such regulations. The absurdity of such a statement is its own refutation. Besides, the board, by its rule No. 153, providing that "the janitor of a building heated by steam shall have an engineer's license as required by city ordinance" admits that its work of education is not interfered with by the application and enforcement of such a police regulation. The above rule is material and admissible on this ground if on no other. And,

since the board makes this admission, surely it cannot lie in the mouth of this janitor to urge that the freedom of the board in the management of its schools is being interfered with by a judgment of conviction in this case.

Neither can it be denied that the ordinance in question is a pure exercise of police power and a wise and reasonable one. Nor do we understand that defendant contends for a moment that it is not. By inference, however, he contends that the qualification of the janitor fireman in charge of a steam boiler carrying more than fifteen'pounds to the square inch is a matter so wholly within the sphere of education and so entirely outside of the sphere of the city's conceded police power, that it must be held that the city has no power to legislate on that qualification. On the contrary, the qualification of the one in charge of such a powerful agency capable of producing disastrous and dangerous results is not a matter within the sphere of, or pertaining to, the work of education at all, but is wholly within the matters of police regulation confided alone to the city and not to the school board. A steam boiler of such capacity, in the hands of an inexperienced and unskilled person, is likely, or at least liable to, explode not only killing and injuring the pupils of the school (who are citizens of the city) but also destroying and setting fire to the building and thereby communicating fire and danger of destruction to the persons and property of the city and of citizens adjacent thereto. To require the school employee, handling such a dangerous agency, to comply with the regulations of the city in regard thereto is no infringement or encroachment upon the power, duties and authority of the school board in its educational work. Nor does it follow that, because such employee is amenable to the police regulations of the city, this makes every other school employee subject to city control.

The board's control, management, direction, operation and care of school property, the policy to be followed in school work, the teachers to be selected, and all other matters directly or even merely incidentally connected with the subject of education in general is left free and untrammelled. And it is only in those matters which involve *purely* a police regulation necessary to the health and safety of persons and property, that the city can interfere. To hold that the city cannot interfere even in such matters, or that if it did, it would infringe upon the jurisdiction of the school board in its constitutionally appointed task of providing education for the citizens of the State, is to hold that the city would have no power to quarantine a school teacher or other school employee afflicted, or thought to be afflicted, with a deadly infectious disease, because this would be adding to his qualifications the requirement that he must be free from all such, and an interference with the board in its power to employ whomsoever it will. It is no answer to say that no school board would object to such a regulation. The question now is as to its right or power to object. Suppose there arose a difference of opinion between the school authorities and the city as to whether the employee had such disease, if defendant's contention be true, the board's decision in the matter would control regardless of the results to the city.

Defendant says it is not a question of what power the city ought to have, but of what power the city has. Is it not rather a question of whether the school board and its employees are *exempt* from the operation and effect of such power? In this particular case the question is as to the exemption of the employee only. The act of the city in this case being concededly an exercise solely of police power, and the operation of such power being omnipresent and universal within the city limits, ought not the school employee to be subject

thereto unless clearly exempted by law? And where is such exemption? Certainly not by express statute. Defendant says it flows from certain decided cases which he cites. But we do not think they are applicable. Take the case of National Waterworks v. School District of Kansas City, 23 Mo. App. 227, so much relied upon by defendant. That was not in reference to the exercise of police power at all. In that case the waterworks company had obtained from the city a franchise by the acceptance of which the water company bound itself to furnish water "for use in all public buildings and offices of the city . . . and . . . shall not have any pay for water the city may so use or take, etc." The school board refused to pay for the water it used claiming it was entitled to get it free since its buildings were "public buildings of the city" within the meaning of the contract between the waterworks company and the city. This court held they were not since the city exercised no control over them, did not own them and was not responsible for them in any way. While they were "public buildings of the city" in one sense, that is, in the sense that the Long building or the Commerce building of the present day are public buildings, yet they are not "city public buildings" in the sense used in the franchise. This was all that was decided, and the remarks of the court could apply almost as well to the two above named buildings now as to school buildings in distinguishing them as "public buildings of the city" from "city public buildings." The school district in that case urged that even though its buildings did not belong to the city and were not under its supervision, yet the city had authority to exert its power beyond its territorial limits, and, therefore, contracted for the use of free water from buildings beyond those it owned and controlled, and in this way school buildings were entitled to free water. But the court said, in answer

to that argument, that such acts of the city were "in the exercise of police power" and therefore could have no application to the case.

We are cited to the case of State ex rel. v. Cole, 220 Mo. 697, but that case dealt solely with the question of the power of the school board to make needful rules for the conduct and management of the school. It had nothing to do with the question of whether or not the school board or a school employee could be required to obey a regulation of the city dealing purely with a police regulation of the city and having nothing to do with the government or control of the school. The question was whether the school board could exclude a child from school who had not been vaccinated. This directly involved the maintenance of the school and of course was within the powers of the board, which was charged with that work.

The case of State ex inf. v. Henderson, 145 Mo. 329, merely decided that the title to school property is vested in the school district as a public, and not as a municipal, corporation; and that the extension of the city limits so as to take in and extinguish Westport did not have the effect of extinguishing the Westport school district. While the court remarks that the school district is independent of the city government, it is speaking of its independence as a separate and district corporation, and not of its nonamenability to regulations involving only the exercise of police power.

The case of School District No. 7 v. School District of St. Joseph, 184 Mo. 140, decides nothing more than that the extension of the city limits of a city of over 50,000 and under 300,000 inhabitants does not, *ipso facto,* extend the limits of the city school district over the territory of the adjoining district included within the extension; and that school districts are distinct corporations from the municipalities in which they are formed.

The case of Milwaukee v. McGregor, 140 Wis. 35 is not decisive of the point here because, in that case the State had by special legislative action, unrestrained by any constitutional limitation, authorized the erection of a state building in a particular way in the city of Milwaukee and it was held that, to follow out such supreme legislative command, it was not necessary to first obtain a building permit from the city inspector.

The case of Fulton v. Sims, 127 Mo. App. 677 is not conclusive, since that was a case wherein the city attempted to regulate the conduct of the business of a state institution in a matter *not affecting the rights of the city* or *the health or safety of its citizens,* but solely affecting the institution's own internal affairs which were regulated by express provisions of the statute. And so on with all the cases wherein it was held that the city could not interfere. It will be found that in all of them the act attempted to be regulated was either a matter not involving the exercise of police power, or, if it was, it affected only the internal arrangement or conduct of the business of the institution, and *not the safety or other rights of the city or of citizens outside the institution.*

It has been held that certain state police regulations may be enacted and enforced even though they apply to persons and corporations engaged in interstate commerce, and this too in the face of the rule that Congress has complete supervision over interstate commerce and no state can pass any law interfering therewith. [1 Freund on Police Power, Sec. 135; New York Railroad v. New York, 165 U. S. 628; Chicago, Rock Island, etc. Railroad v. Arkansas, 219 U. S. 453. Such regulations are not an interference with interstate commerce but an aid to it. In like manner, the ordinance in question is not an interference with the school board in its conduct and management of its business of educating the children of the State. Nor

is the school board here contending that it is. The board by adopting rule No. 153 admits that the regulation is in keeping with their work, and it is only the individual who has violated both the rule and the ordinance who is now raising the point that he is exempt from the operation thereof.

Under defendant's view of the case the school district, merely because it is a quasi political entity of itself, is supreme in its control over its real estate and is not subject to any regulations of the city. It is not necessary to pass on the correctness of this position as to its control over its real estate, since the question is not involved. But if it is meant that on account of such control, the school board does not have to recognize any police regulations whatever, whether solely affecting the public generally or not, then the result of such theory would be to create little separate and independent kingdoms within the city where the sovereignty given to it by the State could not operate. In other words, there would be "spots" in the city where its laws would have no force. Such theory was advanced in United States v. Bateman, 34 Fed. 86, where it was urged that, as a murder was committed on a military reservation belonging to the United States and over which it had sovereign control, the State of California had no authority to enforce its laws against crime committed there. But the court held otherwise.

The sustaining of defendant's conviction in this case does not mean that the public schools are to be put under the domination and control of city politics or city regulations as to the manner in which the schools shall be conducted or its property cared for and controlled. Heaven forbid such a result. Let us hope that the actual separation of our schools from politics is identical with its separation in theory. Such condition is ideal, and, if it exists in fact, let us keep

it so. But the conviction in this case does not tend to destroy that separation. Politics has nothing to do with the qualifications a man should have who is in charge of such a powerful and dangerous agency, as a steam boiler. Nor is the control or authority of the school board involved in any way. The judgment is affirmed. All concur.